Good morning, Your Honors. May it please the Court, Paul Carelli on behalf of the Escondido Union School District. Your Honors, we have raised a lot of issues on appeal in this case, but I'd like to focus my time this morning on the two major legal issues, the issues of qualified immunity and the issue of negligence in the case. In terms of the qualified immunity issue, we had two individual defendants. One was the principal of the school. The other one was the office manager of the school. The contention by the plaintiff is that they violated the dad's parental rights, constitutional rights, by releasing the child during the school day to the mother who had the custodial rights, even though she had been deported at the time of the incident. What happened was that the mom had, several weeks before the incident on December 6th, had called the school and let the school know that she had been deported and asked if it was okay if the child could come over the Thanksgiving and Christmas break to stay with her. The school said that she could do that, but there may not be a chance that he could have the same teacher when he returns to school. In the meantime, the dad, who only had visitation rights under the state court order, under the family law court, had been taking the child to and from school and had left his phone number with the school and had told the teacher that he would be picking up the child. The mom, however, calls the school on December 6th and says that the child has a doctor's appointment and that her friend would be picking up the child at school. There's no dispute that it was the mother who called. The mother gave the name of the person who would be picking up the child. That person showed the correct ID. The principal, by the way, had no knowledge of that phone call on December 6th. No idea. The office manager had then... What's your argument on why there's no clearly established law that was violated? Yes. The argument in terms of no clearly established law that was violated is that although the district recognized that parents have a constitutional right to care and custody of their children, in this particular matter, there was no sufficient case law talking about a situation in which a school releases a child on the direction of a parent who calls into the school and says, please release my child to this particular person. You don't need to have a case that's pinpoint on all factors. We've said that. The Supreme Court has said that. We've said that. I agree. But it has to be sort of in the general... It needs to be in the general category. I completely agree, Your Honor. There is some case law. The district court relied on it. Yes. There is a case the district court relied on, and I believe that we have distinguished those particular cases in our briefing, Your Honor. And I think in this particular case, there's no... The closest case that I can locate on point is this Doe versus Covington case out of the Fifth Circuit, which is a checkout case involving a man who had no business being on the campus and who had checked out this particular student repeatedly and abused her. In this case, we have quite the opposite. We have a mom who has her custodial rights. Let me ask you this. What do you understand... What was the state of the law at the time of this incident on custody, you know, on transferring custody and all of that? The state of the law... Or disrupting a parent to custody. The state of the law, as I understood it, Your Honor, is that just because a parent is deported at one time, that that parent does not lose the state custody rights. There has to be some sort of finding by a family law court of abandonment on the part of the parent to lose those rights. So the dad never went into the state court and said, hey, mom's been deported. I need to have the full parental custody rights in terms of residency. But he still had custody rights. He had very limited... He had limited... No, he may have had... He may not... The kid may not have been living with him, but I understood from the record that they had joint custody. Well, the state court order, Your Honor, specifies that the joint legal custody is decisions made as to the educational decisions, care decisions, but not visitation. Visitation was not within that joint legal custody. That was something separate in a different paragraph in that state court order. That's true, but there's evidence that Maguria knew that the mother was not in this country. So is this child just out there without any supervision? Doesn't that raise a reasonable inference that it must be the father who has some rights, who's caring for this child, who's present in this country? Well, I think that there is some inference, but there's also evidence that the aunt was taking care of the child for quite a while as well, Your Honor. And there is evidence of that. Is there evidence that the school district knew that about the aunt? I don't believe that... Well, that's what's important, isn't it? What did the school district know, and when did it know it? And the school district knew that the mother was not in this country. Well, three weeks before December 6th they knew, sometime during November. Well, isn't it a reasonable inference? But when she calls and she says, I'm at work, I can't pick up my child, he has a doctor's appointment, the school district has to take the mom's word as true. Well, didn't the father, as you noted, I think, and as the record reflects, the father had called in and said, earlier had called in and said, I'm going to be responsible for picking up the kid. He told the teacher sometime that the mom was not around and he would be... I thought he also testified that she had been deported. Yes, I think the school was aware that the mom had been deported, but the testimony also of the office manager was that regularly parents are deported from this particular school and that they come back in fairly quick order. So, in her mind, she had a reasonable belief that the mom was in the country. Wasn't there also testimony that what happened here, and that is accepting the word of a person over the phone, that I am in fact a mother and I authorized this, was an unreasonable determination by the school district. Wasn't there testimony to that effect? Well, there was testimony from the expert, if I recall, that's along those lines. Okay, so there was testimony. If I recall, that was the limit of that. Expert testimony is still testimony. There was some expert testimony, but the expert is not supposed to be testifying to the ultimate issue in the case. What did you object to? And was that allowed in or objection? I can't remember if there was an objection on that point, so I'll have to apologize on that question. In any event, on the qualified immunity issue, your bottom line argument, as you articulated in your brief, is that these particular individual defendants, in doing what they did here, would not have reasonably understood that by releasing the kid to the friend, would have been a violation of Mr. Ramirez's due process rights, liberty interests. That's right, Your Honor, because the— And that's a legal question. That is a legal question. And, of course, we're going to take the facts most favorable of the plaintiffs because we have a judgment in the plaintiff's favor, but those facts need to be applied to the law at hand. Okay, now you said you wanted to address the negligence claim. I want to make sure you do that before your time runs out. Thank you, and I'll probably just reserve a couple minutes. I see that I have a little bit of time left. On the negligence issue, we're talking about the father who is claiming negligent infliction of emotional stress, so under California law he needs to be— the conduct of the school district must be directed at him. Was there any jury instruction given with regard to the negligence claim on duty or the parties in the court view that as a legal issue and it was resolved pre-trial, right? The judge resolved that legal issue in favor of the plaintiff, if I recall correctly, Your Honor. But certainly duty under California law is an issue of law. That's the first question is does the school owe the father a duty because there's the case law essentially says that unless the school takes direct action against that particular third party, the parent in this case, that there's no duty owed. Of course the school owes a duty to the child. Isn't there a duty arising out of the fact that the father, in essence, had taken steps to notify the school of his home situation that the child is with him, to contact him before you take any action with regard to the child, and that the mother had been removed from the country. And so by the school district, whether there's a written policy in place or not, by not being sufficiently sensitive to this home situation that the father took pains to inform the school of, that that was enough to go to the jury. Well, this particular issue on negligence has three reasons why the school district did not owe the duty to the father under the circumstances. The first thing is that even though the father knew that sometime before when the boy was a very young child that the mom had taken him to Mexico for a period of time, he never relayed that information to the school at all. So in other words, he never came to school and said, you know, mom's abducted this kid before, you guys all need to watch out. So that's number one. Number two is that there was no foreseeability of the danger that this mom would take this kid and keep him in Mexico forever and ever. Now, foreseeability is a factual determination that goes to the jury. It can be, yes, Your Honor. Well, what do you mean by it can be? It is. If it's on causation, it is. My understanding was foreseeability was a factual determination. Well, under the Rowland factors, foreseeability is within those duty factors decided by the court. Under causation, certainly, I think foreseeability is something to be decided by the jury. Well, your argument is that, look, as a matter of law, there's not enough facts in this case to demonstrate that he's the direct victim of any purported negligence, right? And so my question to you is, well, why isn't the fact that the father basically specifically informed the school to contact him with regard to actions relating to his child, why isn't that sufficient to make him a direct victim under California case law? Okay, he basically said that he needed to be the person who was going to be contacted. He left his phone number, but that didn't relieve the mother of her bundle of rights that she had, and there's an assumption in the question that once the mom crossed the border into Mexico, she lost all constitutional rights that she had, and I don't think that's the case because that court order still stood. No, I don't think anybody's saying that. It's he, as Judge Wynn just said, he alerted the school that he was going to be the one responsible for picking up the kid. Okay, and mom called and said that she was at work, and I believe that the school district in that situation isn't trying to cover anything up. They're not trying to act in lieu of the parent. They're trying to regard a parent's wishes, a parent with parental rights. And so when mom— Let me ask you this. They had their own little policy, right? Yes, there is. Well, there is an administrative regulation that is an evidence. And if they had followed their—what would have happened if they had literally followed the regulation in this instance? What would have happened? Well, the regulation, I think, was followed, Your Honor. The regulation talks about—and I see my time is almost up, and I do want to reserve. The regulation talks about it's when you can't reach the parent. That is when you can only release the kid to someone on the emergency card. In this case, it's not that the school was looking for the parent. In this case, the parent, the mom, called in and said, I need you to release my son to his medical appointment. Can I ask you something that I couldn't find the answer in the record? Could the mom have called in, let's say the day before, and say, place this guy on the list of persons authorized to pick up my child? Well, I think that she could, but there's nothing in the record that suggests it. I think that she could call with that phone call and say, this is the guy picking him up. He gets to be my proxy. He's my agent, and so, therefore, we can put him on the emergency card. But typically, I think that those cards are filled out. Now, father, by the way— And for good reason, isn't it? Because you have somebody present to do that rather than accepting the word of somebody that, I mean, it's an authentication. I am who I purport to be. Yes. There's no dispute in this case, Your Honor, that the person who picked the child up was who he said, who the mother said he was going to be. And the other person, you know, who's not on the emergency— Well, of course. But that doesn't mean that the person who called in about Mr. Ramos was who she purported to be. I mean, Mr. Ramos identified himself as being the person who was reported on the phone. But that doesn't mean Mr. Ramos is, you know, a nice guy. He could be a terrible guy. He could be a terrible guy, but the evidence showed that there was no distress on— Well, okay. We're getting far afield here. I understand. I'll give you a minute or two for rebuttal. Thank you. Can we give him maybe a minute and a half? Sure. Yeah. You say this verdict is inconsistent, right? Yes, Your Honor. All right. And I understand. I mean, I understand. Tell me where I'm going wrong on your position because I want to understand your position. Basically, your position is all the damages were non-economic in the form of emotional distress and that they made different monetary equations of that emotional distress on the different claims. Yes. And it's your position that the inconsistency is that they can't be different. It's all the same emotional distress and has to be measured the same. And therefore, you should take the lowest amount if you affirm any of these verdicts, which would be, what, $450,000? Yes, Your Honor. And that's your position? Yes, Your Honor. Okay. What authority do you have or rationale for your position? You take the lowest dollar amount versus what the district court did was take the highest dollar amount. Well, I think the answer is two pieces. First of all, I think the district court wanted the three different money decisions by the jury there. So in case two of the cause of action they didn't find anything on, but they found on the third that there was going to be a blank there for the money damages. But second of all, since the same injury occurred and it's all essentially one whole decision, the injury that's suffered under the constitutional tort is the exact same injury that's suffered under the negligence tort. So why not? If that money is sufficient to compensate the plaintiff for that harm, isn't that the same harm as negligence? So it seems to me that that is. Why isn't the other position correct? And that is on the negligence claim there was a determination of past non-economic loss and future non-economic loss to total $2 million. And so they made a determination somewhere along the line that the injury had been $2 million. So why shouldn't that be the figure that applies versus the $450,000? Because, again, Your Honor, the injury is the same. I understand. So it's all $2 million. Except that they found that that same injury was $450,000. So it should be the lowest number because they've already found it. Do you have any authority, Ninth Circuit or otherwise, that that's the way to go? Your Honor, I think we cited the best cases that we could find in our briefing. Okay. Thanks. I appreciate it. I'm sorry to use up your time. No, no. I'll give you a minute or two for rebuttal. Don't worry, Your Honor. Good morning, Your Honors. John Richards on behalf of Manuel Ramirez and his son Enrique Ramirez, also present in court as my co-counsel, William J. Brown, if it pleases the Court. I'd like to start addressing the questions that you first asked counsel regarding his two largest positions, that being qualified immunity and the negligence argument. I'd also like to state that I was the trial attorney that was in court for the week and a half trying this case, and I probably have a little better understanding of some of the facts that came into evidence during that trial. With all due respect to counsel, he was a wonderful appellate attorney. He wasn't the counsel that was in trial with me as well. The evidence that came out in this courtroom was that the father notified the school that he was now going to be taking permanent custody of the child. How did he notify him? He notified both the teacher, and the teacher acknowledged that notification, which was alluded to by counsel. He also testified that I notified the front office, the very person who took the phone call, and said all future calls should come to me. Ms. Maguria? Ms. Maguria. He was also listed on what's called the cumulative card for the child, the CUME file, and his number was on it. The evidence came in that because the mother was being not attentive to the child's needs prior to the deportation, the school was repeatedly calling the father, and he was the one that they were interjecting about the child's truancy. So by the time she's deported, the school knows he is in full legal custody of the child, that she has been deported into Mexico. Legal custody or just de facto custody? Well, he had a joint custody order with the mother. He showed up for every single custody hearing that was there. While the mother did have primary custody, he had visitation of the child on the weekends, the testimony was. He saw the child repeatedly during the pre-period prior to the deportation. So there was a joint legal custody on the custody agreement, which also said, by the way, that no parent shall remove the child from the jurisdiction of San Diego County. But it wasn't the parent in this case. That's what troubles me about this case, and that's a pretty big distinction, right? From the school district's perspective, the mother had rights and the father had rights. So either one of them could have gone through the process of placing somebody on the pickup list, right? So if, let's say, a lot of schools have gone online now, you want to make sure that it was the parent who basically authorized somebody to pick up. So mom can authorize the pickup independently, and so can dad. And just because that third person then takes off with the child, how is the school district responsible for that? A few different points here, and some of the points are well taken conceptually. Mom certainly has rights here. There's no question that mom has rights. We're not saying mom doesn't. The cases that we cited, that Justice Sobros cited in his qualified immunity, the James Rowland case, the Burke case, all of those cases involved situations where the other parent also had rights. But what the district courts were saying in those cases were we're focusing on the right of this particular litigant. That is the focus, were this litigant's rights abridged by the conduct? Nothing about the mom's right, first of all. Well, that gets me to the qualified immunity issue, because the district court relied on James and Burke. But the big distinction in those cases, James was where the social workers and I think the deputy sheriffs transferred the child's custody or physically effectuated a transfer of custody, and Burke was the one where the officers took the child into protective custody, if I'm recalling the facts right. And in both of those cases, the state actors essentially took direct action to interfere with the parental right, the familial rights. Here in this case, the mom allowed a third person to interfere with the dad's rights. Isn't that a distinction that is significant enough such that there's no clearly established law in place? Interesting way to phrase the issue. It also could be argued as a superseding issue, the way that Your Honor has just kind of phrased it. But taking it back to the issue of no clearly established law, in Roland, if you recall, what had occurred was it was the very mother who had requested the transfer to the grandmother, I believe. And so the mother's rights were involved in Roland, and the court in that case still said no notification to the father, then you've abridged his rights by making this transfer. The district court also, Your Honor, in this case, said not only do we have these two cases to look at, but we also have the policy of the school district itself from which we can draw inference to whether this was a clearly established right. How can you do that? That's not constitutionally based. That's their administrative. In a 1983 case, you look at what is the constitutional right at stake. Correct. And as the district court pointed out, in the case of Hope v. Pelzey, that they can consider administrative rulings and whether or not the defendant knew of those rulings to enforce whether or not this was a clearly established right, although in and of itself it doesn't make a clearly established right. But this AR 5142 has its basis, the evidence came, in the education code itself. So it starts as an education code, it becomes an administrative requirement in AR 5142, and then it's adopted by the school district itself. As to that ruling, and there's been considerable discussion about it not being violated, it was clearly violated in this case. That particular policy says no student shall ever leave our school district unless the person picking them up is on the administrative medical emergency card. There are no exceptions, none whatsoever. It came up in court that we didn't violate this, and we went to great lengths to put the testimony of the Principal Gotay and Murgwai both in our briefing, where on cross-examination they admitted to the jury and the court that they in fact violated that policy. Their testimony is, we never followed the policy, we always just took phone calls. And I think Justice Murphy's point is well taken here. If you don't follow the policy, then anyone can call up and a child is susceptible to kidnapping. That's the whole point of this particular policy being in effect. And it's a different situation than, Justice DeWine, you were saying is, well, what if she called and said let's put him on the card? First of all, it didn't happen in this case. Had it happened, then he would have had to show up at the school, present ID, fill out paperwork. This is the brain most who ended up kidnapping the child. And also the father would have been notified that someone else was being added on to the emergency card. There's no paperwork requirement that's filled out. As I understand it, you just fill out a card saying that I'm authorizing the following individuals to be allowed to pick up my child. The policy of the school is that person has to come to the school ahead of time, has to be physically placed on this card, which it's not a paper application for it. They're put into a computer, but they still show up. And at that point in time, the other people on the card are notified. But then, again, we get into the notification of the father's rights at this point. So you're saying that the school district policy is that the other parent gets notified if somebody on the list is picking up the child? I'm saying that the other parent gets notified when someone is added to his child's emergency list. So had they done, which, again, they didn't do in this case, so this is a little bit of an academic point. But had they come in and put this person on the card, which wasn't done, then the father would have been notified that the mother, who he knew had been deported, was attempting to put a nonrelative on the card, which would have raised red flags. This whole case would have been avoided if they just followed the policy, which they did the first time, when the mother called and said, I've been deported. Send my child to Mexico. And Murguia got Gotay on the phone. Gotay, the principal, came over, and they said, no, talk to your husband, talk to the court. Which witness testified to the fact that the father would have been notified, that one parent would be notified if the other parent authorizes somebody to pick up the child? Who testified to that? I believe that is in the record of the way that the card is filled out when the emergency card has an addition placed on the emergency card so that the other parents are aware of it when they're separated as they're in a situation like this. So let's go back to qualified immunity. Sure. I'm sorry. So, you know, the bottom line question for qualified immunity is whether the individual defendants in this particular situation, you know, in the context in which the case arises, would have been aware, the law was sufficiently established, that they would have been aware that in taking the actions that they did would violate Mr. Ramirez's constitutional rights. Right. So you have to look at the law that really existed at that time, and the only two cases you point to are James and Burke, correct? That's true. And the general law of qualified immunity is that, you know, you can't define the right too expansively, but on the other hand, it doesn't need to be, there doesn't need to be case law exactly on point. That's absolutely true. So what is it about Burke and James that would have alerted the principal and Murgia, whoever the defendant is here, that in doing what they did was a violation of the Constitution? I think getting back to, there was the Joby-Covington case, which didn't exist even at the time, that was brought up in a reply brief in this case, and it comes from the Fifth Circuit. I don't think that's instructive to what was going on at the time. At the time that the child was kidnapped by Ramos, there was, in addition to these two cases out there, that placed school districts on notice that separation of parental rights could lead to a constitutional violation. I don't believe the law requires they have specific notice of those cases. It's enough that those cases exist, and they should have known. The law is that a reasonably competent official, had he read these cases, would have understood that their actions violated Ramirez's constitutional rights. If you dovetail that in to AR 5142, which they know comes from the Education Code itself, saying they will never release a child to someone not on the emergency card, which its obvious purpose, right, is to prevent child abduction. There's no two ways about it. There's no other purpose for this law that's out there. That a reasonable principal who reads Burke or reads Rollins and understands that a deprivation of a right of a parent would be caused by a physical separation, and that if they violated their AR 5152 and allowed someone to be kidnapped… So in James, I guess it's James, you know, it's a little bit different. Granted, it's different. You know, you have these child protective service people taking the kid and moving the kid around and all that kind of stuff, and that just doesn't seem to be the fact. But it clearly says that a separation of a child from their parent, even at the hands of another parent's inception, beginning the process, amounts to a constitutional violation if they had no notice. And within their own instructive administrative regulations, this is being reinforced on a daily basis, and the court said the clear violation of the whole thing and the jury's finding of the outrageousness of the violation, because it so clearly led to this kidnapping, it was so obvious. We've sort of beat qualified immunity around, but how about negligence? I mean, so you prevailed on your negligence claim. We prevailed on the negligence. And there, as your opponent stressed, the question is whether or not they owed a duty to Mr. Ramirez. Correct. And clearly this is, again, it's directed at Mr. Ramirez's rights. This is a separation case. In what way was the father a direct victim of the negligence? Well, I mean, starting, and it's become circular, I guess, at some point in time. But we get back to it's his constitutional right to be with his child. So it physically harms him to be separated when his child is being kidnapped. It's not just the child, but it's also his physical separation. A number of the cases that are being cited by the appellant in this case are sexual assault cases. But the cases talk about the school kind of knowingly directing their action towards the parent's rights. Correct. Not just that they were negligent in supervising the child. Why isn't this more of a negligent supervision case, to the extent that there is a case, versus actions being deliberately directed towards the father? So in the case of Phyllis D., which we cited, which is a case that has similar facts to it, the court said that the negligence acts in that case were directed at the parent, and it went through a three-prong test to discuss why they were directed at the parent. I can go through them with you, but one of them was that the parent had asked to be notified, as in this case. They also point out in Phyllis D. that they had prior notice of the propensity of the rapist to do these things, the 13-year-old that was going through this. There's a second prong of that as well. Ultimately, between the three things, they said in not telling the parent, when we had the superior knowledge of what was happening and going on here, and we didn't reach out and provide notice to the parent that we were actively interfering with the rights of the parent, and therefore it was directed at the parents as well. I think clearly the facts in this case do the same thing. And the act of interference with the rights is basically negligently failing to notify him that Mom had authorized somebody else to pick him up? Exactly. If they just would have done what they did three weeks before and said, no, ma'am, call your husband, the school doesn't work this out, we're not going to hand a child off to someone not on the card who's not a relative, thank you very much, this whole thing would have been avoided. This never, ever would have happened. Had they just called the father and said, hey, you know, the child you just dropped off at 8.30, the mom is here to pick him up for a medical appointment at 8.45, that seems a little odd, never would have happened. So Phyllis P., you know, it's an interesting case. It was decided back in the 80s. And since that time, the California Supreme Court has issued a number of opinions dealing with, you know, negligence law and foreseeability and duty and everything. And in Stephen F., which is a more recent case by the California Court of Appeal, it notes that Phyllis P. is a little dated. It doesn't completely repudiate it, but it says it's a little dated. But nonetheless, it does talk about Phyllis P., and I thought that it made a good point, which was that in Phyllis P., Stephen F. says that the actions were directed at the parent. So Stephen F. is talking about Phyllis P., and it says, first, the decision by school officials not to inform the parent of the danger posed by the 13-year-old was clearly a decision directed at the parent. Second, there is a sense of outrageousness in that the decision, which also makes it explainable under Brough's model test. Okay. So I'm trying to think through how that statement fits here. It struck me that Mr. Ramirez had notified them, as you started out explaining. And so when they didn't notify him that somebody else was going to pick up the child, that their actions were directed at him. Correct. And if you add in the jury's findings on punitive damages and IED, i.e. intentional infliction of emotional distress which you've cross-appealed, that seems to add that added kicker that Stephen F. seems to require. And I think clearly the jury found that here. They were so outraged that this simple policy would have prevented the entire kidnapping as to the father, that their fingerprint of outrageous conduct is all over this jury verdict. It's everywhere from the punitive damages findings to the outrageous findings in IIED, as the court pointed out, and that makes this very analogous to what happened in the Philistine. District Court Judge Sebron noted that defendants' knowledge Ramirez was the father, Ramirez's request to be contacted on any matter concerning Enrique, and defendants' failure to contact him in addition to the outrageous findings leads to this distinction that it's being directed at him. I also would point out that all of these Stephen F. cases are all sexual assault cases. They're not separation cases. And while I'm not diminishing the incredible injury that occurs in a sexual assault case, in those cases parents were attempting to be vicariously damaged through the damage that happened to their child to a certain extent. This is a case of a separation, a break in the relationship between a parent and a child. In this case, he hasn't seen his child since and likely never will until the child reaches an age of majority. In this case, the parent was independently injured by his loss of that relationship, as opposed to the Stephen F. cases and the other sexual assault cases, and egregious as they are, where parents were saying my child was sexually assaulted and obviously they were traumatized, so were the parents. I think there's a distinction in separation cases. There might be, but I guess the only point is that we're dealing with a third-party kind of situation. Correct. Negligent infliction of emotional distress, and so you have to look at California's, you know, the way California's law has evolved in that particular kind of area. And even though these are sexual abuse cases, there's some discussion about general tort principles that seem to apply across the board. That is absolutely true, and I do agree with that. I think a lot of the issues bleed from one cause of action to the next in this case as well, with the directed issues both in the IAED. If I can briefly address the IAED. Very briefly. We let you go way over. I'm sorry. The IAED case, the only issue was Christensen allows for a second prong, either the presence of the person, again, or that it be directed at the parent. In the age of the Internet, obviously, the people being actually present for outrageous conduct is going to change its definition. We can't have Christensen physically say that you can only make this claim if you are in someone's home, so they allow for this exception of the directed at. We feel that, again, for the same reasons of negligence, this is clearly being directed at the father. Let me ask you. Yeah, go ahead. In relation to the jury verdict form, there was one injury to Mr. Ramirez, right? Correct. And it's measured by, there's one measurement of damage, emotional distress. And so he was injured in the same way by each claim, under each claim, right? Right. And yet the jury puts in a different dollar figure for each claim. Why is it that the appropriate figure to pick is the highest figure versus the lowest figure? I suppose the easiest analysis is that it subsumes the lower figure, so that if the jury felt that it should be too many in here, the others are just irrelevant because they're a lesser amount. So clearly we're going to take the largest. In this case, however, the jury came out and asked the judge, hey, we've come to an impasse. We have three different figures here. Do we have to reconcile them all because we don't want you to cumulatively add them up, essentially? The judge got everybody together and he said, I'm not going to cumulatively add these all up. I'm going to take the highest. Is that okay with everybody? It's on the record. We put it in our brief. Everyone said sure, went back to the jury. The jury basically got relieved of having to reconcile the numbers at that point because the instruction was that that was fine. We're taking the highest number. And then the judge pointed out later on that the jury verdict form isn't the ultimate verdict. It's his role to weave it into the final judgment, and that's exactly what he did. And subsuming would be the word I would use, Your Honor. Okay. Thank you. Thank you, Counsel. Okay, well, I'll allow some time. Two minutes. Thank you, Your Honors. In the Phyllis P. case, there was a 13-year-old that had sexually molested the 8-year-old a number of times. The school hid that fact from the parents, put the kid into psychological counseling without the parents' knowledge, and then at some later time the 13-year-old molested the 8-year-old again. And the parent under that case was determined to be a direct victim because the school had usurped the parental prerogative to decide what was best for their child. In Stephen F., on the other hand, the school teacher had an affair with a student, and the court said that, number one, there was no warning of the propensity of the teacher to commit sexual abuse of a kid, no knowledge of the danger on the part of the school. Your case is somewhere in between. Is that fair to say? Yes, but I think that our case is closer to the Stephen F. case, and here's why. Number one, there was no evidence whatsoever that Mr. Ramirez told the school that there was some danger that, oh, my God, if Mom calls, she's going to abduct the kid. It didn't happen. So why would the school be on notice of the worst possible event, that this kid is going to be taken by Mom and taken to Mexico forever and never heard from again? They did call and say, I'm in charge. I'm going to be doing the pickup. Okay, and the mom then called, and she had, again, every right to call and say, okay, this is my right, and I want the kid to go to the doctor's appointment. You keep saying the mom called. They had no verification that that was the mom or that it was somebody else calling. The testimony was that when the mom called, she verified her I.D. by stating the kid's name and the teacher's name. So there was that evidence, and there's no dispute from the other side that it was the mother who did call. I understand that, but that doesn't mean that it was clear to the school district that that was the mother. I mean, it seems a little careless. I mean, you know, if I want somebody on my own behalf to kidnap a kid, I'm going to know the name of the kid, and I'm going to know the name of the kid's teacher, and I'm going to call in and say, release him to this gentleman. Okay, but they had also talked to that mom before, so I think we can assume that they recognized the mother and talked to her. So I think that's a piece of evidence as well. There was evidence of that. Can you address counsel's point that there's evidence in the record that under normal circumstances the other parent would be contacted if you put somebody new on the list? I don't have – I'm not sure I know where that is in the record, Your Honor. I don't think that that exists. Well, he said there was some evidence presented regarding how these emergency card forms are filled out. Is that right? I believe that there was evidence on how the cards were filled out. I was just looking at the exhibits. I didn't see anything that suggested that the other parent had to be contacted if someone's added to the emergency card. So it may or may not be in the record. We just have to look. Yes, and I apologize, Your Honor, for that. But again, with regard to Stephen F., the school district didn't have a conscious – did not consciously try to usurp the dad's prerogative. They also had the mother who, again, had her bundle of constitutional rights that was just as broad as the dad's. Again, just because she had been deported doesn't mean that she was not back in the country. And she had every right to have her child go to a doctor's appointment. I think that the school district had every right to believe that she had the best interest of her child at heart. They have to assume her good conduct. So with that, Your Honors, I appreciate your time this morning. Thank you. Thank you. Interesting case. Matters submitted.
judges: Murphy, Paez, Nguyen